UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERALPHA STEEL LLC, | ) | No. 03 B 43059 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| FEDERALPHA STEEL LLC CREDITORS' TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05 A 978 |
| | ) | |
| FEDERAL PIPE & STEEL CORPORATION; | ) | |
| RUSSEL METALS, INC.; FA STEEL | ) | |
| MANAGEMENT, INC.; GILLES LEROUX; | ) | |
| SYLVAIN GARNEAU; WIRTH LIMITED; | ) | |
| and SUNBELT GROUP, LLP, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

In May 2002, Federal Pipe & Steel Corporation and Alpha Steel Corporation jointly formed Federalpha Steel LLC to run three steel service centers. Federalpha rapidly ran into financial trouble. In mid-2003, Russel Metals, Inc. acquired Federal Pipe's parent company. On reviewing Federal Pipe's financial condition, Russel Metals concluded that the liability posed by Federalpha was too great: Federal Pipe had to withdraw from Federalpha before Federalpha ended up in bankruptcy. On October 30, 2003, Federal Pipe did withdraw, securing a full release of any claims Federalpha had against Federal Pipe, its affiliates, officers, and employees. The next day, Federalpha sought relief under chapter 11 of the Bankruptcy Code.

A plan of reorganization proposed by Federalpha was confirmed on August 25, 2004.

Under the plan, unsecured creditors received $900,000. They also received certain causes of

action Federalpha had against Federal Pipe, Russel Metals, and other insiders of Federalpha. A

trust agreement created the Federalpha Steel LLC Creditors' Trust, and another agreement

formally assigned to the Trust the causes of action described in the plan. The plan provided that

any recovery on the assigned causes of action would not belong to the estate but would be

distributed on a pro rata basis to unsecured creditors.

In March 2005, the Trust brought a fifteen-count complaint against Federal Pipe, Russel

Metals, two Russel Metals subsidiaries (Wirth Limited and Sunbelt Group, LLP), and two former

managers of Federalpha who were also officers of Federal Pipe (Sylvain Garneau and Gilles

Leroux). Counts I and II of the complaint seek to avoid the release Federalpha gave to Federal

Pipe on the ground that it was a fraudulent transfer under sections 548(a)(1)(A) and (B) of the

Code. Counts III through XII are state law claims against various defendants.[1] Count XIII

alleges that Russel Metals received from Federalpha preferential transfers voidable under section

547. Counts XIV and XV allege that Wirth and Sunbelt also received voidable preferential

transfers from Federalpha.

Federal Pipe, Russel Metals, Leroux, and Garneau have now filed a series of motions

---

[1]     Count III alleges that Federal Pipe breached the agreement under which it
withdrew from Federalpha. Counts IV through VI allege that Federal Pipe breached Federalpha's
operating agreement by failing to make contributions, wrongfully dissociating from Federalpha,
and violating a non-competition provision. Counts VII and VIII allege that Federal Pipe, Leroux,
and Garneau violated their fiduciary duties to Federalpha. Count IX alleges that Russel Metals
intentionally interfered with Federalpha's operating agreement. Count X alleges that Russel
Metals intentionally induced Federal Pipe to breach its fiduciary duties to Federalpha. Counts XI
and XII allege that Federal Pipe intentionally, or at least negligently, misrepresented Federalpha's
creditworthiness to unsecured creditors.

seeking dismissal of all counts of the complaint or abstention on certain counts.[2]  Specifically, these defendants contend that the state law claims in Counts III through XII should be dismissed for lack of subject matter jurisdiction, and that if those counts are dismissed, the court should abstain from hearing Counts I and II.  Alternatively, the moving defendants assert that Counts I through XII should be dismissed for failure to state a claim or plead fraud with particularity, and Russel Metals argues that Counts IX, X, and XIII should be dismissed for lack of personal jurisdiction.

For the reasons discussed below, the motion to dismiss Counts III through XII for lack of subject matter jurisdiction and for abstention on Counts I and II will be granted.  The motion to dismiss Count XIII for lack of personal jurisdiction, however, will be denied.

## 1. Jurisdiction

The court has subject matter jurisdiction over Counts I, II, and XIII of the complaint pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a).  The claims in those counts constitute core proceedings.  28 U.S.C. §§ 157(b)(2)(A), (E), (F), (H).   As for Counts III through XII, a court always has jurisdiction to determine its jurisdiction.  *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 775 (7th Cir. 2002).

## 2. Facts

The complaint (along with the attached exhibits) alleges the following facts, all of which are assumed to be true for the purpose of determining subject matter jurisdiction.  *See Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001).

---

[2]      Wirth and Sunbelt have not joined in the motions and have answered Counts XIV and XV, respectively.

Federalpha was a venture formed by two unprofitable steel operating companies, Federal Pipe and Alpha Steel. (Compl. at ¶ 2). Alpha Steel was a family-owned enterprise that operated a single steel service center in Hammond, Indiana. (*Id.* at ¶ 15). Federal Pipe, a wholly-owned subsidiary of Leroux Steel (*id.* at ¶ 3), was much larger, operating a network of over fifty steel service centers in the midwest and eastern United States (*id.* at ¶ 12). Alpha Steel and Federal Pipe both lost money in 2001 and the first half of 2002. (*Id.* at ¶¶ 13-14, 17). Their combined losses in the first half of 2002 totaled more than $2 million. (*Id.* at ¶ 18).

In early or mid-2002, Alpha Steel and Federal Pipe decided to create Federalpha to own and operate three unprofitable steel service centers located in the Midwest: Alpha Steel's Hammond facility and Federal Pipe's facilities in Peotone, Illinois, and Plymouth, Michigan. (*Id.* at ¶ 19).

On May 6, 2002, Federalpha was duly formed as an Illinois limited liability company. (*Id.* at ¶ 20). On July 9, 2002, Federal Pipe and Alpha Steel executed an operating agreement for Federalpha. (*Id.* at ¶ 21). Federalpha was to be a "manager-managed" LLC. (*Id.* at ¶ 22; Ex. A at ¶ 5.1.1). FA Steel Management, Inc., a corporation wholly owned by Federalpha, was the designated manager. (Compl. at ¶ 23; Ex. A at ¶ 5.1.1). But although FA Steel was purportedly vested with management authority, Federalpha was actually run as a joint venture over which Federal Pipe actively exercised *de facto* authority. (Compl. at ¶ 23). Gilles Leroux, chairman, president, and CEO of Leroux Steel, and Sylvain Garneau, executive vice president of Federal Pipe, were Federal Pipe's two representatives on FA Steel's board of directors. (*Id.* at ¶¶ 5-6).

To operate, Federalpha needed funding, but it had no operating history of its own and consisted of three unprofitable steel centers. (*Id.* at ¶ 24). Because Federal Pipe had been active in the steel service center industry for more than fifty years, it shouldered the burden of obtaining

-4-

bank and trade credit for Federalpha. (*Id.* at ¶¶ 25-26). Federal Pipe unconditionally guaranteed

Federalpha's obligations to its lenders. (*Id.* at ¶ 27). Capitalizing on its own existing business

relationships, Federal Pipe also represented to Federalpha's prospective trading partners that it

stood behind Federalpha and that Federalpha was creditworthy. (*Id.* at ¶¶ 29-30). But for these

representations and the need to maintain good relations with Federal Pipe, these trading partners

would not have done business with Federalpha. (*Id.* at ¶¶ 31-32).

Despite Federal Pipe's representations, Federalpha in fact was not creditworthy. (*Id.* at ¶

34). Federal Pipe and Alpha Steel never contributed enough capital to Federalpha to give it a

reasonable chance of success. (*Id.* at ¶ 35). In addition, Federal Pipe and Alpha Steel assigned to

Federalpha $20 million in liabilities and $0 in accounts receivable. (*Id.* at ¶¶ 36-37, 39). And

when Federalpha violated the financial covenants with its lenders only four months after its

formation, Federal Pipe failed to contribute the cash, property, and services Federalpha needed to

survive, although the operating agreement required these contributions. (*Id.* at ¶¶ 43-45).

In early 2003, Russel Metals began taking steps to acquire Leroux Steel, Federal Pipe's

parent company. (*Id.* at ¶¶ 47-48). Around the same time, Russel Metals reviewed Federal

Pipe's operations and concluded that Federalpha was not profitable and was at risk of insolvency.

(*Id.* at ¶ 49). At the direction of Russel Metals, Federal Pipe made a *de facto* withdrawal from

Federalpha. (*Id.* at ¶¶ 50-52). Federal Pipe stopped participating in Federalpha's management

and stopped honoring its duties and obligations under the operating agreement. (*Id.* at ¶ 50).

Leroux and Garneau likewise ceased all efforts as directors of FA Steel to manage Federalpha.

(*Id.* at ¶ 51).

In July 2003, Russel Metals completed its acquisition of Leroux Steel. (*Id.* at ¶ 53). The

same month, executives of Russel Metals acknowledged internally that bankruptcy was a

possibility for Federalpha. (*Id.* at ¶ 55). Russel Metals also concluded that Federal Pipe's

obligations to Federalpha and its lenders represented a $5 million contingent liability. (*Id.* at ¶

57). Russel Metals and Federal Pipe accordingly began devising a way for Federal Pipe to

withdraw formally from Federalpha before Federalpha ended up in bankruptcy. (*Id.* at ¶ 58). In

doing so, Russel Metals, Federal Pipe, Leroux, and Garneau sought to maximize the benefits to

Russel Metals and Federal Pipe from the withdrawal regardless of the welfare of Federalpha, the

interests of Federalpha's creditors, and the duties and obligations Federal Pipe owed to

Federalpha under the operating agreement. (*Id.*).

On September 30, 2003, Federal Pipe, Alpha Steel, PHA Steel LLC (an Alpha Steel

affiliate), and Federalpha entered into an agreement allowing Federal Pipe to withdraw as a

member of Federalpha and releasing (among other things) all claims of Federalpha against

Federal Pipe and its "affiliates, officers or employees." (*Id.* at ¶¶ 59-60). Under the agreement,

Federal Pipe assumed certain liabilities of Federalpha and also funded a $1 million certificate of

deposit to be pledged as collateral in favor of Federalpha's lenders. (*Id.* at ¶ 63). The transaction

closed on October 20, 2003. (*Id.* at ¶ 66).

The terms notwithstanding, Federalpha and its creditors in fact received little or no

benefit from the agreement. (*Id.* at ¶ 62). For the most part, Federal Pipe was already liable for

the obligations it assumed, including obligations to Federalpha's lenders. (*Id.* at ¶¶ 64-65).

One day after Federal Pipe's withdrawal, Federalpha filed its bankruptcy petition. (*Id.* at

¶ 67).

### 3. Analysis

Counts III through XII in the Trust's complaint will be dismissed for lack of subject

matter jurisdiction. Those counts are state law claims between non-debtors and so are not

"related to" the bankruptcy case. Because Counts III through XII must be dismissed, the court

will abstain under 28 U.S.C. § 1334(c)(1) from hearing Counts I and II. The claims in those

counts are analytically related to the dismissed Counts III through XII in such a way that

abstention is the sensible course. The remaining count, Count XIII against Russel Metals, will

not be dismissed for lack of personal jurisdiction. The Trust has established a *prima facie* case of

personal jurisdiction over Russel Metals.[3/]

### a. Subject Matter Jurisdiction

Counts III through XII must be dismissed for lack of subject matter jurisdiction. The

claims in those counts do not arise under title 11, do not arise in a case under title 11, and are not

"related to" a case under title 11. 11 U.S.C. § 1334(b).

Subject matter jurisdiction is a threshold question, "the first question in every case," *State

of Ill. v. City of Chi.*, 137 F.3d 474, 478 (7th Cir. 1998), because without jurisdiction the "court

cannot proceed at all," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (internal

quotation omitted). It is not enough that a debtor's confirmed plan purports to confer jurisdiction

over particular matters, as article 13 of the Federalpha plan does. *See Zerand-Bernal Group, Inc.

v. Cox*, 23 F.3d 159, 163-64 (7th Cir. 1994). The requirements of section 1334(b) must still be

met. *S.N.A. Nut Co. v. Häagen-Dazs Co. (In re S.N.A. Nut Co.)*, 206 B.R. 495, 500 (Bankr. N.D.

Ill. 1997).

Bankruptcy jurisdiction exists over claims that either arise under title 11 or that arise in

---

[3/]    Because Counts I through XII will be disposed of through dismissal for lack of
subject matter jurisdiction or through abstention, other objections to those counts need not be
addressed.

or are "related to" a case under title 11. 28 U.S.C. § 1334(b). The Trust's claims in Counts III

through XII plainly do not arise under title 11 because they are state law claims, not claims

"created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood),* 825

F.2d 90, 96 (5th Cir. 1987). It is equally plain that the claims in those counts do not arise in a

case under title 11: they do not concern "administrative matters that arise *only* in bankruptcy

cases." *Id.* at 97 (internal quotation omitted) (emphasis in original). The real question, and the

question the parties dispute, is whether the claims in Counts III through XII are at least "related

to" the Federalpha bankruptcy.

They are not. Under the Seventh Circuit's strict interpretation of "related to" jurisdiction,

a dispute is "related to" a bankruptcy only if "the dispute affects the amount of property for

distribution [i.e., the debtor's estate] or the allocation of property among creditors." *In re Fedpak*

*Sys., Inc.,* 80 F.3d 207, 213-14 (7th Cir. 1996) (internal quotation omitted). A particular

dispute's mere overlap with the debtor's affairs is not enough. *Home Ins. Co. v. Cooper &*

*Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir. 1989). Ordinarily, then, the damage claims of one non-

debtor against another are not matters over which the bankruptcy court has jurisdiction. *See, e.g.,*

*Wayne Film Sys. Corp. v. Film Recovery Sys. Corp.,* 64 B.R. 45, 52-53 (N.D. Ill. 1986)

(dismissing creditor's damage claims against third parties as neither "arising in" nor "related to"

bankruptcy); *In re O'Malley,* 252 B.R. 451, 458-59 (Bankr. N.D. Ill. 1999) (dismissing non-

debtor's fraud claims against other non-debtors for lack of jurisdiction).

After confirmation of a chapter 11 plan, moreover, "related to" jurisdiction is "sharply

reduced." *Cytomedix, Inc. v. Perfusion Partners & Assocs., Inc.,* 243 F. Supp. 2d 786, 789 (N.D.

Ill. 2003); *see Pettibone Corp. v. Easley,* 935 F.2d 120, 122 (7th Cir. 1991). The number of

issues potentially affecting the estate or the administration of the case necessarily decreases at

-8-

that point. *Conseco, Inc. v. Adams (In re Conseco, Inc.),* 318 B.R. 425, 432 (Bankr. N.D. Ill. 2004). Post-confirmation "related to" jurisdiction is therefore appropriate "only to ensure that reorganization plans are implemented and to protect estate assets devoted to implement the confirmed plan." *Cytomedix,* 243 F. Supp. 2d at 789. Once assets have left the estate, the court's jurisdiction to decide disputes involving them lapses. *FedPak,* 80 F.3d at 214.

The Trust's recovery on the claims in Counts III through XII will not affect the amount of estate property distributed to creditors in the bankruptcy. The claims were themselves property of the bankruptcy estate, *see Polis v. Getaways, Inc. (In re Polis),* 217 F.3d 899, 901 (7th Cir. 2000), and under the plan those claims were transferred to the Trust at confirmation. At that point, they no longer belonged to the estate. Because the property has been distributed, the Trust's recovery on the claims can have no effect on the amount of estate property distributed to creditors.[4] *See Fedpak,* 80 F.3d at 214; *Zerand-Bernal,* 23 F.3d at 162. The property may later turn out to be worth more or less, depending on how the litigation of the claims goes, and creditors may ultimately receive more or less as a result. But that is not enough to confer jurisdiction, any more than would post-distribution fluctuations in the value of a car or television.

For the same reasons, the Trust's recovery on Counts III through XII will not affect the allocation of estate property among creditors, either. Again, the property in the form of the claims has already been distributed. Anything unsecured creditors receive from the Trust's recovery will be distributions of Trust property, not property of the Federalpha bankruptcy estate.

---

[4]    It would be another matter if the Federalpha plan had said the Trust's recovery on the claims became part of the estate. *See S.N.A. Nut Co.,* 206 B.R. at 499-501 (finding "related to" jurisdiction where confirmed chapter 11 plan specified that any recovery from litigation would remain in the debtor's estate pursuant to section 1141(b)). But it does not. The plan says that any recovery will be distributed pro rata directly to Federalpha's general unsecured creditors.

(And even if this were not the case, the allocation of the Trust's recovery has been decided: the
plan says that any recovery must be distributed to unsecured creditors on a pro rata basis.) Once
the claims were transferred to the Trust on confirmation, there was no longer a question of
allocation of estate property among creditors any more than there was a question of the amount
of estate property to be distributed. Jurisdiction over those claims ended. *See Fedpak,* 80 F.3d at
214; *Zerand-Bernal,* 23 F.3d at 162. Counts III through XII must be dismissed.

        To this conclusion, the Trust offers only token resistance. The Trust asserts that the
claims have a "direct nexus" to the bankruptcy and that their prosecution is "integral to the
implementation of the plan." The Trust adds that the transferred claims represented "a
substantial part of the consideration" for the unsecured creditors' votes to accept the plan; a
dismissal, the Trust says, would deprive these creditors of the benefit of their bargain.

        These assertions have no relevance to the jurisdictional challenge here. Questions about
whether a claim is "integral" to the bankruptcy process and whether the claim has a "close
nexus" to the plan or the bankruptcy are important under some views of "related to" jurisdiction,
*see, e.g., Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.),* 372 F.3d 154, 166-67 (3rd
Cir. 2004), but not under the Seventh Circuit's "narrow view," *Doctors Hosp. of Hyde Park, Inc.
v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 308 B.R. 311, 317 (Bankr. N.D. Ill. 2004);
*see Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics),* 813 F.2d 127, 131 (7th Cir. 1987) (stating
that "related to" jurisdiction provides a forum for "claims to the [debtor's] assets" and "extends
no farther than its purpose"); *see also Fedpak,* 80 F.3d at 213-14 (criticizing the Third Circuit's
notion of "related to" jurisdiction as too broad). At no point does the Trust contend that

                                              -10-

jurisdiction exists under the law of this circuit.[5/]

As for the suggestion that unsecured creditors will lose the benefit of their bargain if the state law claims are dismissed, the Trust substantially overstates matters. Dismissal of these claims for lack of jurisdiction will simply deprive the Trust of one forum in which to have those claims decided. It will not deprive the Trust of the claims themselves which presumably can be adjudicated elsewhere. See Hill v. Potter, 352 F.3d 1142, 1146-47 (7th Cir. 2003) (noting that dismissals for lack of jurisdiction are always "without prejudice" and are preclusive only on the jurisdictional issue). The unsecured creditors' bargain was for the claims, not for a particular forum.

Because the claims in Counts III through XII are not "related to" the Federalpha bankruptcy, the court lacks jurisdiction to hear those claims. 11 U.S.C. § 1334(b). Counts III through XII will be dismissed.[6/]

---

[5/]      Both sides make a great deal out of recent bankruptcy cases from the Third Circuit addressing post-confirmation "related to" jurisdiction over claims assigned to a liquidating creditor trust. See AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust), 335 B.R. 309 (Bankr. D. Del. 2005); Shandler v. DLJ Merch. Banking, Inc. (In re Insilco Tech., Inc.), 330 B.R. 512 (Bankr. D. Del. 2005). These cases understandably employ the Third Circuit's analysis and so provide no guidance here.

[6/]      This dismissal may strike some as hypertechnical, exalting form over substance. The Trust, after all, is simply pursuing for the benefit of creditors claims that the debtor would have pursued for the benefit of creditors had there been no Trust. It could fairly be asked whether the mere transfer of these claims to the Trust should be dispositive of the jurisdictional issue. The fact remains, however, that the claims are no longer property of the estate, so their liquidation affects neither the distribution of estate property nor its allocation among creditors. There is, consequently, no jurisdiction. And if that result seems formalistic, even mechanical, jurisdictional rules are meant to be mechanical. Indeed, "[t]he more mechanical the application of a jurisdictional rule, the better. The chief and often the only virtue of a jurisdictional rule is clarity." Hoagland v. Sandberg, Phoenix & von Gontard, P.C., 385 F.3d 737, 740 (7th Cir. 2004) (internal quotation omitted); see also Helm v. Resolution Trust Corp., 18 F.3d 446, 447 (7th Cir. 1994). Should sensible bankruptcy policy warrant a departure from the result that this circuit's narrow interpretation of "related to" jurisdiction dictates, the court of appeals will have

### b. Abstention

Given the dismissal of Counts III through XII for lack of jurisdiction, the only practical

option is for the court to exercise its discretion under 28 U.S.C. § 1334(c)(1) and abstain from

hearing the claims in Counts I and II. To do anything else would be inefficient and wasteful.

Section 1334(c)(1) permits the court to abstain from hearing a proceeding "in the interest

of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. §

1334(c)(1); *see In re Kewanee Boiler Corp.*, 270 B.R. 912, 922 (Bankr. N.D. Ill. 2002). Because

this provision is "somewhat oblique," *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 6

F.3d 1184, 1189 (7th Cir. 1993), the Seventh Circuit has identified twelve factors to "provide

more concrete guidance," *id.*[2] These factors are to be applied "flexibly, for their relevance and

importance will vary with the particular circumstances of each case." *Id.* No one factor is

determinative. *Id.*; *see also In re Repurchase Corp.*, 329 B.R. 832, 836 (Bankr. N.D. Ill. 2005).

Whether to abstain rests with the court's discretion. *In re U.S. Brass Corp.*, 110 F.3d 1261, 1268

(7th Cir. 1997).

Efficiency and judicial economy are what point to abstention in this case. *See New Eng.*

*Power & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equip. & Marine, Inc.)*,

_____

to say so. In the meantime, this court's task is to follow that court's decisions. *See Reiser v.*
*Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

    [2]       The factors are (1) the effect of abstention on the efficient administration of the
estate; (2) the predomination of state law issues over issues of bankruptcy law; (3) the difficulty
or unsettled nature of the applicable law; (4) the presence of a related proceeding in a state or
other nonbankruptcy court; (5) the federal jurisdictional basis other than 28 U.S.C. § 1334; (6)
the relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance
rather than form of an asserted "core" proceeding; (8) the feasibility of severing state law claims
from core bankruptcy matters; (9) the burden on the bankruptcy court's docket; (10) the
likelihood of forum shopping; (11) the existence of a right to a jury trial; and (12) the presence of
nondebtor parties. *Chicago, Milwaukee*, 6 F.3d at 1189.

292 F.3d 61, 69 (1st Cir. 2002) (affirming abstention based in part on "judicial economy"); *In re*

*Resource Tech. Corp.,* No. 03 C 5785, 2004 WL 419918, at *2-3 (N.D. Ill. Feb. 13, 2004)

(affirming abstention on the basis of "efficiency"). Counts I and II are claims under section

548(a) to avoid the release Federal Pipe received in the agreement allowing it to withdraw from

Federalpha. These counts come first in the Trust's complaint for a reason: avoiding the release

is a prerequisite to the assertion of the state law claims that follow in Counts III through XII.

Because those claims are subject to the release, they cannot be asserted unless the release is

invalidated. (Or, as the defendants put it somewhat differently, setting aside the release will be

necessary to "blunt a possible defense . . . to the . . . state law claims." (Def. Mot. at 3.))

        But the bankruptcy court will not decide the state law claims to which Counts I and II are

tied. As discussed above, the court has no jurisdiction to decide them. The claims in Counts III

through XII will necessarily be decided elsewhere – in a federal district court or perhaps a state

court. It only makes sense, then, for the court that will decide Counts III through XII to decide

Counts I and II as well. To proceed otherwise would require the parties to litigate the avoidance

claims in two courts (since the release will likely be asserted as a defense to the state law claims);

would risk inconsistent decisions about the validity of the release; and would needlessly require

two judges to become familiar with the Trust's claims and their involved background. Given the

logical connection between Counts I and II and the dismissed Counts III through XII, one court

should hear and determine all of the claims. *Cf. Shell Materials, Inc. v. First Bank of Pinellas*

*County (In re Shell Materials, Inc.),* 50 B.R. 44, 46 (Bankr. M.D. Fla. 1985) (declining to abstain

where core matters were "inextricably interwoven" with claims as to which the court could have

abstained).

        Although these considerations are enough, it is worth noting that additional factors favor

-13-

abstention.[8/] Abstention will have no effect on the bankruptcy estate for the same reason that the

state law claims are not related to the bankruptcy. It is too late for those claims to have an effect:

the plan has been confirmed, and all property of the estate has been distributed to creditors. The

claims in Counts I and II are therefore remote from the main bankruptcy case. Like the state law

claims, they were property of the estate, property that has been distributed. Counts I and II

cannot be severed from the state law claims, but here that weighs in favor of abstention rather

than against it. All parties, finally, are nondebtors; its plan confirmed, debtor Federalpha has left

the scene. Although the avoidance claims are technically "core" proceedings, at this point they

have more to do with the dismissed state law claims than with the bankruptcy.

Because Counts I and II are linked to the dismissed Counts III through XII, the court will

exercise its discretion under section 1334(c)(1) and abstain from hearing Counts I and II.

### c. Personal Jurisdiction

The only matter remaining is the motion of Russel Metals to dismiss Count XIII for lack

of personal jurisdiction. Because the Trust has demonstrated that Russel Metals has minimum

contacts with the United States, and because it is fair to exercise jurisdiction over Russel Metals,

the motion to dismiss Count XIII will be denied.

### i. Procedural Posture

A plaintiff has no obligation to allege in its complaint facts that if true would establish

---

[8/]      Not every factor from the *Chicago, Milwaukee* decision is discussed here, but
nothing in that decision demands that a bankruptcy court explicitly address each factor. *See
Resource Tech. Corp.,* 2004 WL 419918, at *6 (noting that "the law does not require a judge to
intone in every case each of the multiple factors involved in a determination of this type; a judge
is permitted to focus on what is important"). The factors are simply meant to provide
"guidance." *Chicago, Milwaukee,* 6 F.3d at 1189.

personal jurisdiction over the defendant. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003); *Steel Warehouse of Wis., Inc. v. Leach,* 154 F.3d 712, 715 (7th Cir. 1998). Once the defendant moves to dismiss for lack of jurisdiction, however, the burden falls on the plaintiff to demonstrate jurisdiction. *Purdue,* 338 F.3d at 782; *see also Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 939 (7th Cir. 2000).

The nature of the plaintiff's burden depends on whether the court holds an evidentiary hearing. If it does, jurisdiction must be proved by a preponderance of the evidence. *Purdue,* 338 F.3d at 782. If it does not, and the motion is decided on the submission of written materials, the plaintiff "'need only make out a *prima facie* case of personal jurisdiction.'" *Id.* at 782 (quoting *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002). The plaintiff is entitled to have resolved in his favor all disputes of fact that those materials raise. *Id.*

In this case, the Trust and Russel Metals have submitted written materials on the jurisdictional question. Neither party has sought a hearing or suggested any facts are in dispute. The parties agree the Trust need make only a *prima facie* showing of jurisdiction.

### ii. Jurisdictional Facts

To support dismissal, Russel Metals relies on the affidavit of Brian R. Hedges, its executive vice president and CFO. In his affidavit, Hedges notes that Russel Metals is a Canadian corporation with its principal place of business in Ontario. He then asserts that Russel Metals transacts no business in the U.S., owns and leases no property in the U.S., solicits no business in the U.S., pays no U.S. taxes, advertises no products in the U.S., maintains no physical inventory in the U.S., has no listings in U.S. telephone directories, has never conducted a

shareholder or board of directors meeting in the U.S., and has no employees who conduct
business on the company's behalf in the U.S. (Hedges Aff. at ¶¶ 2-11).

       The Trust answers the Hedges affidavit with seven large volumes of exhibits proving
false many of Hedges' assertions. The Trust's exhibits show the following.

       Located in Mississauga, Ontario, Russel Metals is a steel distributor and processor with
three principal business segments: metals service centers, energy tubular products, and steel
distributors. (T. Ex. A at 7; T. Ex. H at 1).[9] By its own description, Russel Metals is "one of the
largest metals distribution and processing companies in North America based on revenues." (T.
Ex. H at 1). Together with its subsidiaries, the company had revenues in 2004 of some $2.4
billion (Canadian). (*Id.*). Russel Metals has forty-eight affiliated business units. (T. Ex. F). Of
these, twenty-two are U.S. subsidiaries, all of them wholly owned. (T. Ex. A at 7; T. Ex. F). In
2004, the U.S. subsidiaries accounted for 25% of Russel Metals' total revenues. (T. Ex. A at 7).

       Russel Metals operates its steel distribution business in large part through its subsidiaries.
In the U.S., Russel Metals Williams Bachall, Inc. and Baldwin International run steel service
centers, Sunbelt handles import-export operations, and Pioneer Pipe is responsible for energy
tubular products. (T. Ex. H at 5-7; T. Ex. P at RM 624). In Canada, Wirth handles import-
export operations; Fedmet Tubulars, Comco Pipe, and Triumph Tubulars are responsible for
energy tubular products; and A.J. Forsyth, Drummond McCall, Vantage Laser, McCabe Steel,
Acier Leroux, and Russel Metals itself operate service centers. (T. Ex. H at 5-7; T. Ex. P at RM
623-625). Other U.S. subsidiaries, such as FIL (US), Inc. and RMI USA, LLC, are involved in
Russel Metals' financial affairs. (*See* T. Ex. A at 9; T. Ex. I at RM 57; T. Ex. J at RM 368).

_____

       [9]     The Trust's exhibits are cited as "T. Ex. ___." Page numbers for an exhibit are
either the exhibit's own or are Bates numbers with the prefix "RM."

Russel Metals exerts considerable control over its U.S. subsidiaries, with many of its own officers and directors also serving as officers and directors of the subsidiaries. (T. Ex. B). For example, Edward "Bud" Siegel, Jr., president, chief executive officer, and a director of Russel Metals, is also an officer, director, or both of more than fifteen Russel Metals U.S. subsidiaries.[10] (*Id.*). Brian Hedges, mentioned earlier, serves as an officer, director, or both of more than twenty U.S. subsidiaries. (*Id.*). So does Marion Britton, vice president and chief accounting officer of Russel Metals. (*Id.*). And Elaine Hillis, assistant secretary of Russel Metals, is secretary or assistant secretary of fourteen U.S. subsidiaries. (*Id.*).

Russel Metals injects itself directly into the operation of its U.S. subsidiaries in several ways. It appoints the chief operating officers of each subsidiary. (T. Ex. A at 11). It approves the bonuses of all senior management. (*Id.*). It performs management reviews twice a year at each subsidiary – a total of forty-four meetings each year. (*Id.* at 12). It reviews each capital expenditure made by the subsidiaries in excess of $100,000. (*Id.* at 11). And it provides computing services to some subsidiaries and computing and accounting services to its Wisconsin subsidiary. (*Id.* at 10).

Russel Metals has frequently held itself and its subsidiaries out as a single, integrated entity doing business throughout North America. In a 2004 S.E.C. filing, Russel Metals characterized itself as a North American conglomerate with a substantial U.S. presence. (*See* T. Ex. H at 2-10). In presentations conducted in 2003 and 2004 in connection with a sale of its securities, Russel Metals also made itself and its subsidiaries out to be a single North American enterprise. (*See, e.g.,* T. Ex. P at RM 588, 590, 592-93, 610, 620, 623-24).

---

[10]    Siegel himself is a U.S. resident, living in Connecticut. (T. Ex. C at RM 6).

-17-

Russel Metals does business in the U.S. not only through its subsidiaries but also in its own right. In 2004, Russel Metals sold $74.9 million (Canadian) of steel to U.S. buyers. (T. Ex. A at 7; *see* T. Ex. D). In 2004, it also purchased $148.6 million (Canadian) of steel from U.S. sellers. (T. Ex. A at 7; *see* T. Ex. E). In July 2003, Russel Metals filed a Pennsylvania Department of Revenue Business Activities Questionnaire stating that it was engaged in metals distribution in Pennsylvania. (T. Ex. G).

Russel Metals has had other contacts with the U.S. In February 2003 and 2004, Russel Metals conducted its board of directors meetings in Naples, Florida. (T. Ex. A at 12). Since at least 2002, Russel Metals has filed tax returns with the Internal Revenue Service and with the State of Michigan. (*Id.* at 22). In 2002-03, the company made more than fifty filings with the S.E.C. (*Id.*).

Russel Metals has also had extensive financial dealings in this country, including sales of its own securities. Between 2003 and 2004, Russel Metals and one of its wholly-owned U.S. subsidiaries, RMI USA, participated in a tender offer and solicitation in the U.S. to repurchase certain notes of the two entities totaling $115,600,000 (U.S.). (*Id.* at 9; T. Ex. J). Russel Metals used U.S. financial institutions to execute the tender offer. (T. Ex. J at RM 399). Among other things, Russel Metals entered into an agreement with Citigroup Global Markets, Inc. to serve as "Dealer Manager" for the tender offer. (T. Ex. L). The Citigroup agreement contained a forum selection clause under which Russel Metals agreed to submit itself to the jurisdiction of any New York federal or state court in connection with any dispute arising out of either the agreement or the transaction itself. (*Id.* at RM 413).

On February 13, 2004, in New York, Russel Metals entered into a purchase agreement for the issuance and sale of $175,000,000 of certain Russel Metals corporate bonds to a consortium

-18-

of U.S. financial institutions. (T. Ex. M at RM 547, 579). The agreement contained a forum

selection clause under which Russel Metals agreed to submit to the jurisdiction of any New York

court in connection with disputes arising out of the agreement. (*Id.* at RM 560). A week later,

Russel Metals entered into an indenture with U.S. Bank N.A., as trustee. (T. Ex. N at RM 422-

23). The indenture likewise contained a forum selection clause under which Russel Metals

agreed to submit to the jurisdiction of any New York federal or state court. (*Id.* at RM 518).

Russel Metals then marketed these bonds in the U.S. (T. Ex. A at 12; T. Ex. P at RM

582). In 2003 and 2004, Siegel toured the eastern half of the U.S. on behalf of the company,

making elaborate presentations to potential investors. (T. Ex. A at 12; T. Ex. P). Siegel made a

total of five appearances before investors in Boston, Chicago, and New York. (*Id.*). Hedges

participated in at least one of these presentations. (*See* T. Ex. P at RM 585). In his presentations,

Siegel emphasized that Russel Metals had operations in Utah, Colorado, Kansas, Texas,

Wisconsin, New York, and Ohio. (*Id.* at RM 590, 595, 625).

In October 2004, Russel Metals and another U.S. subsidiary, FIL (US), Inc., entered into

a credit agreement with a syndicate of U.S. and Canadian banks to obtain $200 million in secured

financing. (T. Ex. A at 9; T. Ex. I at 19). The agreement contained a forum selection clause

under which Russel Metals agreed to submit itself to the jurisdiction of any New York state or

federal court in connection with any dispute arising out of the agreement. (T. Ex. I at 106).

Russel Metals is in fact currently a defendant in an action styled *Harbor Enterprises, Inc.,*

*et al. v. WPT Holdings Ltd., et al.,* No. A01-029 CV (HRH), pending in the U.S. District Court

for the District of Alaska. (T. Ex. Q). Russel Metals has apparently not contested personal

jurisdiction in that action. (*See* Russel Metals Reply at 12 n.11).

### iii. Jurisdictional Analysis

Every personal jurisdiction dispute raises two questions. The first is whether some federal statute or rule provides a basis for exercising jurisdiction. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004); *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001). In adversary proceedings in bankruptcy, Rule 7004(f) provides that basis, stating that service of process is effective to establish personal jurisdiction "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States." Fed. R. Bankr. P. 7004(f). Rule 7004(f) thus permits "worldwide service of process, limited only by the due process clause of the Fifth Amendment." *North v. Winterthur Assurances (In re North)*, 279 B.R. 845, 853 (Bankr. D. Ariz. 2002).

The second question – and the one the parties here dispute – is whether exercising jurisdiction over the defendant is consistent with the Fifth Amendment. For personal jurisdiction to be proper, the Due Process Clause requires that the defendant have "minimum contacts" with the forum.[11] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal quotation omitted); *International Med. Group. Inc. v. American Arbitration Ass'n, Inc.*, 312 F.3d 833, 846 (7th Cir. 2002). The contacts cannot have been "random," "fortuitous," or "attenuated." *Burger King*, 471 U.S. at 475 (internal quotations omitted). Instead, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." *Id.* at 475 (internal quotation omitted). The

---

[11]     Although the "minimum contacts" test is premised on the Due Process Clause of the Fourteenth Amendment, courts faced with jurisdictional disputes under the Fifth Amendment typically apply the same test. *AstroPower*, 335 B.R. at 317; *Anheuser-Busch, Inc. v. Paques, Inc. (In re Paques, Inc.)*, 277 B.R. 615, 628 (Bankr. E.D. Pa. 2000); 4 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1068.1 at 594-95 (2002).

-20-

"crucial inquiry" is whether the contacts with the forum are such that the defendant "should reasonably anticipate being haled into court there." *International Med. Group,* 312 F.3d at 846.

A defendant's contacts can give rise to "specific" or "general" jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn.8-9 (1984). Specific jurisdiction exists when the action against the defendant arises out of or is related to the defendant's contacts. *Id.* at 414 n.8. General jurisdiction, on the other hand, exists when the contacts with the forum are unrelated to the action. *Id.* at 414 n.9. The requirements for general jurisdiction are "considerably more stringent" than those for specific jurisdiction. *Purdue,* 338 F.3d at 787 (internal quotation omitted). The defendant's contacts with the forum must be "so continuous and systematic that the defendant could reasonably foresee being haled into court in that [forum] for *any* matter." *International Med. Group,* 312 F.3d at 846 (emphasis added). They must be "so extensive" that the defendant is, for all intents and purposes, "constructively present" in the forum. *Purdue,* 338 F.3d at 787.

When the Fifth Amendment governs personal jurisdiction, however, the relevant forum is not the state in which the court sits. Under the Fifth Amendment, "due process requires only that each party have sufficient contacts with the United States as a whole rather than any particular state or other geographic area." *United States v. De Ortiz,* 910 F.2d 376, 382 (7th Cir. 1990); *see also United Rope Distribs., Inc. v. Seatriumph Marine Corp.,* 930 F.2d 532, 534 (7th Cir. 1991); *AstroPower,* 335 B.R. at 317; *North,* 279 B.R. at 851. To satisfy due process, then, a defendant like Russel Metals in a case like this need have only minimum "national contacts." *United Rope,* 930 F.2d at 534.

If the defendant has minimum contacts, finally, a court must still consider whether the exercise of personal jurisdiction "would offend traditional notions of fair play and substantial

-21-

justice." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113 (1987) (internal quotation

omitted); *see also Burger King,* 471 U.S. at 476. As appropriate, the court may evaluate several

factors, including the hardship that appearing in the forum would pose to the defendant, the

interests of the plaintiff, and the forum's interest in adjudicating the dispute.[12] *Asahi,* 480 U.S. at

113; *Burger King,* 471 U.S. at 477; *Purdue,* 338 F.3d at 781; *International Med. Group,* 312

F.3d at 846. The burden of showing that jurisdiction is unreasonable falls on the defendant, and

the defendant must make a "compelling case." *Burger King,* 471 U.S. at 476-77; *see Purdue,* 338

F.3d at 781 n.10 (noting that "[t]hese factors rarely will justify a determination against personal

jurisdiction").

Russel Metals has the necessary minimum contacts with the United States to support

general personal jurisdiction. Russel Metals buys and sells large quantities of steel in the U.S.,

with purchases in 2004 of $148.6 million (Canadian) and sales that year of $74.9 million

(Canadian). It files U.S. tax returns, both federal and state, and also makes numerous filings with

the S.E.C. The company has held board meetings in Florida, and Siegel, its president and CEO,

---

[12]      When the Fifth Amendment is involved, there is some question whether the
analysis extends beyond the minimum contacts issue. *See Pinker v. Roche Holdings Ltd.,* 292
F.3d 361, 370 n.2 (3rd Cir. 2002) (noting the debate); 4 C. Wright & A. Miller, *supra,* § 1068.1
at 601-06. Some courts hold that due process is satisfied as long as the defendant has minimum
contacts with the United States, leaving problems of the forum's inconvenience to the venue
statutes. *See, e.g., Warfield v. KR Entm't, Inc. (In re Federal Fountain, Inc.),* 165 F.3d 600, 602
(8th Cir. 1999). Others examine minimum contacts and then apply a modified fairness test,
asking whether the proposed forum puts the defendant at a "severe disadvantage," and if so,
whether the "federal interest" in having the matter litigated in that forum outweighs the
inconvenience to the defendant. *See, e.g., Republic of Pan. v. BCCI Holdings (Lux.) S.A.,* 119
F.3d 935, 948 (11th Cir. 1997). The Seventh Circuit seems to be in the first camp. *See United
Rope,* 930 F.2d at 534 (declaring that due process "requires only that the defendant possess
sufficient contacts with the United States" and that convenience of the forum "is a question of
venue and discretionary doctrines allowing transfers"). Out of an abundance of caution,
however, the analysis here will follow the usual Fourteenth Amendment path.

lives in Connecticut. Russel Metals executives make some forty-four trips to the U.S. annually to perform management reviews at the twenty-two Russel Metals U.S. subsidiaries.

More than once, Russel Metals has entered into large financial transactions in the U.S. with U.S. financial institutions, transactions involving hundreds of millions of dollars. Each time, Russel Metals has consented to the jurisdiction of U.S. courts should disputes about the transactions arise. In 2004, the company issued securities through U.S. financial institutions, again consenting to the jurisdiction of U.S. courts. In connection with the offering, president and CEO Siegel (as well as executive vice president and CFO Hedges) went on a multi-city U.S. tour marketing the securities to U.S. investors. In his presentations, Siegel described Russel Metals as a North American enterprise with a substantial U.S. presence, drawing little distinction between Russel Metals and its U.S. operations.

Given the totality of the circumstances, *see Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1361-62 (7th Cir. 1996), Russel Metals has "continuous and systematic" contacts with the United States, *International Med. Group,* 312 F.3d at 846, contacts neither "random," "fortuitous," nor "attenuated," *Burger King,* 471 U.S. at 475 (internal quotations omitted).

The exercise of jurisdiction also comports with "traditional notions of fair play and substantial justice." *Asahi,* 480 U.S. at 113 (internal quotation omitted). The burden on Russel Metals of litigating here will be minimal. Travel from Canada to the U.S. is quick and inexpensive. Mississauga, Ontario, Russel Metals' home, is just over the border, and Chicago is no farther from Mississauga than New York,[13] where the company has been only too happy to

---

[13]      The court can take judicial notice of indisputable geographical facts, including distances. *See* Fed. R. Evid. 201(b)(2); *Muckleshoot Tribe v. Lummi Indian Tribe,* 141 F.3d

consent to the jurisdiction of American courts.[14]  Russel Metals personnel already make frequent

trips to this country, visiting the company's many U.S. subsidiaries and even holding board

meetings in the U.S.  Canadian defendants as a rule bear "a substantially lighter burden"

litigating in the U.S. "than . . . most other foreign defendants." *Aristech Chem. Int'l Ltd. v.*

*Acrylic Fabricators Ltd.,* 138 F.3d 624, 628 (6th Cir. 1998); *see also Sculptchair, Inc. v. Century*

*Arts, Ltd.,* 94 F.3d 623, 631 (11th Cir. 1996) (finding burden on Canadian defendant "relatively

uncompelling").

        Nor would Russel Metals experience any particular culture shock litigating here.  Canada

is, of course, a western, English-speaking country.  Based on common law, the Canadian legal

system is similar to its American counterpart. *See Aristech,* 138 F.3d at 629; *Ensign-Bickford*

*Co. v. ICI Explosives USA Inc.,* 817 F. Supp. 1018, 1031 (D. Conn. 1993).  Even Canadian and

American bankruptcy law have many features in common. *See* Nathalie Martin, *Common-Law*

*Bankruptcy Systems: Similarities and Differences,* 11 Am. Bankr. Inst. L. Rev. 367, 398-405

(2003); Jacob S. Ziegel, *Canada's Phased-in Bankruptcy Law Reform,* 70 Am. Bankr. L.J. 383,

387 (1996).

        The United States and the Trust, meanwhile, have a substantial interest in this court

exercising jurisdiction over the Trust's claim against Russel Metals.  The federal bankruptcy

system is designed to provide "one forum for adjudicating almost all disputes arising in or out of

a particular case." *Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.),* 192

---

1355, 1358 n.4 (9th Cir. 1998).

        [14]      Chicago is also considerably closer and more convenient to Mississauga than
Alaska, where Russel Metals is currently embroiled in federal litigation, litigation in which it has
not seen fit to contest personal jurisdiction.

B.R. 461, 476 (Bankr. N.D. Ill. 1996). The interest is especially strong here, given that the

Trust's claim is a preference claim under section 547 of the Code and so is a core bankruptcy

matter, *see* 28 U.S.C. § 157(b)(2)(F). *See Schwinn,* 192 B.R. at 475-77 (concluding that the

bankruptcy court had a "substantial interest" in adjudicating a preference claim against a foreign

defendant and denying that defendant's motion to dismiss for lack of personal jurisdiction).

In short, Russel Metals has made no case, let alone a "compelling case," *Burger King,*

471 U.S. at 477, that this court's exercise of personal jurisdiction over the company would

somehow violate traditional notions of fair play and substantial justice despite the company's

many U.S. contacts.

Russel Metals instead focuses its attention on the contacts themselves, arguing that

particular contacts are either not relevant or not contacts at all.[15] Russel Metals first makes the

startling assertion that it neither buys nor sells any steel in the U.S. Citing some thirty-year-old

decisions, *see, e.g., Charia v. Cigarette Racing Team, Inc.,* 583 F.2d 184 (5th Cir. 1978), Russel

Metals notes that all shipments each way were sent "f.o.b." the shipping point, which was either

---

[15]     Russel Metals' main complaint is that the Trust attributes contacts of the
company's U.S. subsidiaries to Russel Metals itself. (Russel Metals Reply at 4-7). As Russel
Metals rightly notes, a foreign corporation does not have minimum contacts merely because of its
"stock ownership in or affiliation with" a U.S. subsidiary. *Central States,* 230 F.3d at 943; *see
also Purdue,* 338 F.3d at 788 n.17. To impute the subsidiary's contacts to the parent, there must
be evidence both that the parent exerts "an unusually high degree of control over the subsidiary"
and that "corporate formalities" have not been "substantially observed." *Central States,* 230 F.3d
at 943. The Trust has not shown that Russel Metals fails to observe corporate formalities with
respect to its subsidiaries. And although Russel Metals appears to exercise a "high" degree of
control over its subsidiaries, the Trust has not shown that degree of control to be "unusually
high." *See id.* In finding personal jurisdiction over Russel Metals, however, the court has not
relied on the contacts of the subsidiaries. Russel Metals has more than enough U.S. contacts of
its own to satisfy due process. *See Pinker,* 292 F.3d at 373 n.6 (declining to decide whether
subsidiaries' contacts could be considered where parent's contacts alone conferred jurisdiction).

the U.S. or Canada.[16/] (Russel Metals Reply at 9; *see also* T. Ex. A at 7).

This argument might have some force if Russel Metals had only limited U.S. purchases or sales – the odd bar or coil here and there. *See Charia*, 583 F.2d at 189 (noting that seller had only "four sporadic and isolated sales"). But Russel Metals bought and sold hundreds of millions of dollars in steel here in 2004 alone. That shipments in and out of the U.S. are made f.o.b. has little relevance when, as in this case, "the quantity and regularity of shipments" are large and the defendant has other contacts with the forum.[17/] *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 471-72 (5th Cir. 2006) (distinguishing *Charia*); *see also Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 63-64 (1st Cir. 2002) (stating that "[t]he shipment of large quantities of goods into a state, even F.O.B., can satisfy the minimum contacts prong of the due process inquiry"); *Roberts v. Owens-Corning Fiberglass Corp.*, 101 F. Supp. 2d 1076, 1082-83 (S.D. Ind. 1999) (citing decisions and noting that this argument "has failed to overcome the exercise of personal jurisdiction in past cases").

Russel Metals next argues that a corporation's efforts to obtain capital in this country do

---

[16/]    When a seller ships goods "f.o.b." ("free on board") a particular location, title to the goods and the risk of loss typically pass to the buyer at that location. *Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 238 n.1 (N.D. Ind. 1998); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* §§ 3-5 at 128-29, 5-2 at 252-54 (4th ed. 1995). So Russel Metals is contending that its shipments to the U.S. "f.o.b." a Canadian shipping point were in reality simply shipments within Canada, not shipments to the U.S. at all. Shipments to Russel Metals from the U.S. were similarly domestic U.S. shipments, nothing more.

[17/]    Russel Metals also argues that its purchases of steel from U.S. sellers, no matter how regular, are insufficient to confer general jurisdiction. (Russel Metals Reply at 8). Perhaps the purchases alone would be insufficient. *See Helicopteros*, 466 U.S. at 418 (noting that "mere purchases, even if occurring at regular intervals, are not enough"). But Russel Metals has sales as well as purchases in the U.S., lots of them, and it has other contacts with this country, too. Russel Metals cannot defeat jurisdiction by isolating each contact and then dismissing it as inadequate. *See Mid-America Tablewares*, 100 F.3d at 1361-62.

not constitute minimum contacts. Therefore, the company says, its 2003-04 tender offer, the 2004 credit agreement, and the 2004 corporate bond offering are irrelevant. (Russel Metals Reply at 18).

One or two transactions might well not be enough in themselves to constitute the sort of continuous and systematic contacts necessary for general jurisdiction.[18] *See Consolidated Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292-93 (11th Cir. 2000); *but see Republic of Arg. v. Weltover, Inc.,* 504 U.S. 607, 619-20 (1992) (holding that "[b]y issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city," a foreign government had the requisite minimum contacts). Here, however, Russel Metals engaged in three transactions in two years, each involving more than $100 million, including a bond offering in connection with which Russel Metals executives put on a series of road shows in this country for U.S. investors. More important, Russel Metals again "fails to appreciate that the minimum contacts inquiry is one that examines the totality of the circumstances." *Mid-America Tablewares,* 100 F.3d at 1361. The question, then, is not whether the transactions standing alone are minimum contacts. They do not stand alone.

Finally, Russel Metals contends that its failure to contest personal jurisdiction in the Alaska litigation is not a waiver to "all objections to jurisdiction in American courts." (Russel Metals Reply at 12). Presumably, the company would also contend that the forum selection

---

[18]       Russel Metals itself offers no helpful authority on this point. As Russel Metals concedes, each of the unpublished decisions cited in its reply was decided under New York state law. *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,* No. 1428 (SAS), 01 Civ. 7342, 2003 WL 1807148, at *4 (S.D.N.Y. Apr. 4, 2003); *Clarke v. Fonix Corp.,* No. 98 Civ. 6116 (RPP), 1999 WL 105031, at *5 (S.D.N.Y. Mar. 1, 1999); *Crucible Ventures, Inc. v. Futuresat Indus., Inc.,* No. 88 Civ. 4251 (MJL), 1990 WL 16140, at *2 (S.D.N.Y. Feb. 15, 1990). New York's long-arm statute "does not reach to the limits of due process." *Pieczenik v. Dyax Corp.,* 265 F.3d 1329, 1333 (Fed. Cir. 2001).

-27-

clauses in the various transaction documents would not have that effect, either.

Russel Metals is probably right that the forum selection clauses, limited as they are to courts in New York, have not waived objections to general U.S. jurisdiction. Russel Metals is probably right as well that its defense of the Alaska case has not waived the personal jurisdiction objection here. *See Rozenblat v. Sandia Corp.*, No. 04 C 3289, 2005 WL 1126879, at *2 (N.D. Ill. May 2, 2005) (stating that the defendant's appearance in previous action did not waive "all personal jurisdiction requirements for future actions"). But waiver is not the point. Russel Metals' involvement in the transactions and in the Alaska litigation are additional U.S. contacts. The company's evident willingness to subject itself to suit in the U.S. underscores that there is nothing unfair or unjust about the assertion of jurisdiction. And Russel Metals' selective and expedient invocation of its due process rights suggests that the jurisdictional objection in this case should not be taken too seriously.

Because Russel Metals has minimum contacts with the United States sufficient to confer general jurisdiction, and because the exercise of jurisdiction would not violate traditional notions of fair play and substantial justice, the motion of Russel Metals to dismiss Count XIII for lack of personal jurisdiction will be denied.

### 4. Conclusion

The motion of defendants Federal Pipe & Steel Corporation, Russel Metals, Inc., Sylvain Garneau, and Gilles Leroux to dismiss Counts III through XII of the complaint of plaintiff Federalpha Steel LLC Creditors' Trust for lack of subject matter jurisdiction is granted. The motion of defendants Federal Pipe & Steel Corporation, Russel Metals, Inc., Sylvain Garneau, and Gilles Leroux for abstention on Counts I and II of the complaint is also granted. The motion

of defendant Russel Metals, Inc. to dismiss Count XIII of the complaint for lack of personal

jurisdiction is denied. In all other respects, the motions to dismiss are denied as moot.

A separate order will be entered in accordance with this opinion.


Dated: May 31, 2006

_____
A. Benjamin Goldgar
United States Bankruptcy Judge